93.    All releases, discharges, and injunctions with respect to Released Parties and Protected Parties set forth in the Plan are inextricably intertwined, are an integral part of the Plan, are fair, equitable, reasonable, and in the best interests of the Debtor and its estate, the Reorganized Debtor, the Asbestos Trusts, and holders of Claims, Equity Interests and Demands.

94.    The Plan grants releases to, among others, the Verhalen Entities and the Cafco Europe Companies (each as defined in the Verhalen Settlement Agreement) and Charles D. Santomeno. Counsel for the ACC proffered evidence in support of the releases granted under the Plan. Counsel for the ACC also referred the Bankruptcy Court to the motion (Dkt. No. 2945) and arguments previously submitted to the Court in support of the Verhalen Settlement Agreement, and incorporated those reasons into the justifications presented to support the Plan releases.

**Releases Granted to the Verhalen Entities and the Cafco Europe Companies**

95.    Some of the Verhalen Entities (including the principal member of that group, James P. Verhalen, Sr. ("Verhalen")) owned or controlled, directly or indirectly, almost 100% of the stock of USM.

96.    Mr. Verhalen was a party to an employment agreement with USM, dated as of April 1, 1998 ("Verhalen Employment Agreement"). The Verhalen Employment Agreement had an original term of four years, with a continuous evergreen renewal provision. Until the rejection of the Verhalen Employment Agreement as of March 22, 2005, Mr. Verhalen was the Chairman and Chief Executive Officer of USM. Mr. Verhalen filed an unsecured claim for $2.36 million in damages arising out of the rejection of the Verhalen Employment Agreement, and a related administrative expense claim for $222,000.

97.    Mr. Verhalen and/or other Verhalen Entities also own or control, directly or indirectly, a group of foreign companies referred to as the "Cafco Europe Companies." The Cafco Europe Companies were parties to a pre-petition technology sharing agreement with USM (the "Cafco Agreement") which provided, among other things, for a worldwide geographical division of markets between USM, on one hand, and the Cafco Europe Companies, on the other hand, and for the sharing of certain technology between those groups.

98.    The Verhalen Entities and the Cafco Europe Companies entered into the Verhalen Settlement Agreement with the Chapter 11 Trustee, the ACC, the Legal Representative and certain other parties in July 2005. After notice and a hearing, the Bankruptcy Court (Fitzgerald, B.J.) approved the Verhalen Settlement Agreement by order dated September 7, 2005 (Hearing Exh. 8).

99.    The plan proponents concluded that the Debtor could not successfully reorganize without the Verhalen Settlement Agreement, including the releases contemplated therein, because the alternative complex litigation that would have ensued without a settlement could not have been resolved in a time and manner that would have allowed for a successful reorganization. The plan proponents and the Debtor deemed it critical to the reorganization to continue the Cafco Agreement, but under a restructured contractual arrangement. Accordingly, by facilitating the resolution of the issues surrounding the Cafco Agreement, the Verhalen Settlement Agreement provides significant benefits that are critical to the success of the reorganization. In addition, under the Verhalen Agreement, Mr. Verhalen agreed to withdraw his claims and, together with certain other of the Verhalen Entities and the Cafco Europe Companies, to support a reorganization plan that provided for the transfer of all equity in the Debtor to one or more trusts trust to be established under Section 524(g) of the Bankruptcy

Code.   The settling parties under the Verhalen Settlement Agreement received consideration including the limited continued employment of Mr. Verhalen on enumerated terms, an exchange of general releases, continuation of the Cafco Agreement as modified on agreed terms (including certain releases and waivers of claims and rights to declare prior defaults), and the inclusion of the parties identified as Excluded Persons in Section 1.1.56(a)-(o) of the Plan as Released Parties under the confirmed Plan.

### Release Granted to Charles D. Santomeno

100.   Mr. Santomeno is the President and Chief Operating Officer of USM, having served in those positions for approximately 15 years.   Santomeno was a party to the Old Santomeno Employment Agreement with USM, dated as of April 1, 1998 (Hearing Exh. 9).   Mr. Santomeno is party to the New Santomeno Employment Agreement with the Reorganized Debtor, which will become operative on the Effective Date of the Plan (Hearing Exh. 10).

101.   The Old Santomeno Employment Agreement contained an evergreen renewal provision, and provided for an annual salary which, as of 2004, was $275,000, and a target bonus of 75% of salary (or $206,250, for 2004), plus other benefits and consideration.   Rejection of that contract could have resulted in a claim against the Debtor's estate of as much as $2,000,000, much of which could have been asserted as an administrative expense claim.   The plan proponents concluded that it was highly unlikely that the Debtor's estate had the resources to pay that amount (if it had required to do so) and to reorganize.

102.   Mr. Santomeno provided services to the Debtor and the Chapter 11 Trustee and in connection with the Chapter 11 Case that were critical to the success of the reorganization, because of his long roles of having had primary operational responsibility for the Debtor business, the results of which are driven by sales.   The Legal Representative, the Chapter 11

Trustee and the ACC all deemed it essential to the reorganization of the Debtor to resolve Mr. Santomeno's employment under a modified agreement and to enter into a new employment agreement continuing Santomeno's employment without the evergreen clause, thereby avoiding possible disputes and obligations relating to rejection of the Old Santomeno Employment Agreement.

103.    The ACC and the Legal Representative undertook primary responsibility to negotiate the New Santomeno Employment Agreement (Hearing Exh. 10), which will become operative on the Effective Date. In return for his entering into that agreement, the Plan grants Mr. Santomeno a release which the plan proponents believe to be integral and critical to the settlement of the Old Santomeno Employment Agreement and consummation of the Plan. In return, under the New Santomeno Employment Agreement Santomeno gives the Debtor substantial consideration including, among other things, a release of claims that he could assert for rejection of the Old Santomeno Employment Agreement, elimination of an evergreen employment renewal provision, reduction of salary and bonus (to $300,000 a year, plus a modest bonus, in place of the $275,000 salary and target bonus under the old agreement) and other economic terms of his employment, and revision of his responsibilities in light of the employment of the company's new chief executive officer, Sylvester F. Miniter, III, as of the Effective Date.

**Objections to Confirmation**

104.    The Disclosure Statement Order fixed October 28, 2005, at 4:00 p.m. (Eastern Time) as the deadline for filing objections to the Plan.

105.    No objections to confirmation were timely filed.

106.    The MFS Objection to confirmation was filed eleven days after the Objection Deadline set by the Court in the Disclosure Statement Order. While the tardiness of the MFS

Objection is a sufficient independent ground for the Court to overrule it, the Court finds that the Technical Modifications and certain pre-existing language in the Plan fully respond to the MFS Objection. The MFS Objection, therefore, should also be overruled on the merits.

**Environmental Remediation**

107.   Section 11.2.9 of the Plan requires that, as a condition to the effectiveness of the Plan, the Chapter 11 Trustee, on behalf of the Debtor and for the benefit of the Reorganized Debtor, must receive any regulatory or governmental approvals that may be required to consummate the Plan.

108.   On the Effective Date, all of the Debtor's outstanding common stock will be canceled, and all new common stock of the Reorganized Debtor will be issued of record to the PI Asbestos Trust.

109.   The Chapter 11 Trustee testified to his understanding that the cancellation of old common stock and issuance of new common stock will constitute a change of control for purposes of the New Jersey Industrial Site Remediation Act, N.J.S.A. §13:1K-6 *et seq.* ("ISRA"), and will trigger obligations for remediation of certain environmental conditions existing at the Debtor's real property in New Jersey. The Chapter 11 Trustee further testified to his understanding that, to fulfill the environmental remediation requirements under ISRA, on the Effective Date, the Debtor or Reorganized Debtor will be required to enter into a remediation agreement or administrative consent order with NJDEP, provide a funding source for the remediation efforts pursuant to that agreement or order, and thereafter obtain approval from NJDEP of a remediation plan and implement that plan to obtain closure of the matter before the NJDEP.

29

110.    The Chapter 11 Trustee and representatives of the Debtor are engaged in negotiating a remediation plan and remediation agreement or administrative consent order with NJDEP, which will provide for the creation of a separate environmental remediation trust fund ("RTF") in an amount expected to be not more than $2,000,000. The RTF will be funded by the Debtor or its estate on the Effective Date, and will constitute the funding source for the remediation efforts to be undertaken thereafter by the Reorganized Debtor pursuant to the remediation agreement.

111.    The plan proponents requested that the Confirmation Order specifically authorize the use of not more than $2,000,000 to fund the RTF on the Effective Date. Pursuant to the Post-Petition Financing Order entered by the Court on June 27, 2005 (Dkt. No. 2901), the Chapter 11 Trustee holds in a separate account approximately $2,100,000 of proceeds of a settlement of a non-bankruptcy insurance coverage lawsuit. The plan proponents advised the Court that it was their intention to fund the RTF from the proceeds of that separate account. The excess remaining after funding the RTF will be remitted to the Asbestos Trusts as part of the Asbestos Trust Contribution pursuant to the Plan.

**CONCLUSIONS OF LAW**

112.    The Plan should be confirmed. The Technical Modifications should be approved.

113.    The plan proponents satisfied their burden to prove the elements of Sections 1129(a) and (b) of the Bankruptcy Code by a preponderance of the evidence, which is the applicable evidentiary standard.

114.    The MFS Objection should be overruled.

**Transmittal and Mailing of Materials; Sufficiency of Notice**

115.    The Disclosure Statement, Plan, Confirmation Hearing Notice and ballots were transmitted and served in compliance with the Disclosure Statement Order and all applicable Bankruptcy Rules, and such transmittal and service were adequate and sufficient. Adequate and sufficient notice of the Confirmation Hearing was given in compliance with the Bankruptcy Rules and the Disclosure Statement Order, and no further notice is required.

**Solicitation Procedures**

116.    The procedures by which ballots for acceptance or rejection of each Plan were distributed and tabulated were fair and properly conducted in accordance with Bankruptcy Rule 3018, Section 1126 of the Bankruptcy Code and all applicable prior orders of this Court.

117.    All procedures used to distribute solicitation materials to the applicable holders of Claims and Interests and to receive and tabulate ballots were fair and conducted in accordance with the Disclosure Statement Order, the Bankruptcy Code, the Bankruptcy Rules and the local rules of this Court, and all other applicable rules, laws and regulations.

118.    Solicitation of the Plan was undertaken and conducted in good faith and in compliance with Sections 1125 and 1126 of the Bankruptcy Code, Bankruptcy Rules 3017 and 3018, the Disclosure Statement, and Disclosure Statement Order, and all other applicable provisions of the Bankruptcy Code and other applicable rules, laws and regulations.

**The Plan Complies With the Requirements
for Confirmation under Section 1129 of the Bankruptcy Code**

**Section 1129(a)(1) – The Plan Complies
with the Provisions of the Bankruptcy Code**

119.    The Plan complies with all applicable provisions of the Bankruptcy Code as required by Section 1129(a)(1) of the Bankruptcy Code.

31

120.    As required by Section 1122(a) of the Bankruptcy Code, Articles V, VI, and VII of the Plan classify each claim against and equity interest in the Debtor into a class containing only substantially similar claims or equity interests, as the case may be.  A reasonable basis exists for the classification scheme employed by the Plan, and the classification of claims and equity interests is fair and reasonable.

121.    Pursuant to Section 1123(a)(1) of the Bankruptcy Code, Article V of the Plan properly sets forth the classification of all claims against the Debtor.

122.    Pursuant to Section 1123(a)(2) of the Bankruptcy Code, Article 7.1 of the Plan properly identifies and describes the treatment of each class of claims that is not impaired under the Plan.

123.    Pursuant to Section 1123(a)(3) of the Bankruptcy Code, Articles 7.2, 7.3, 7.4, 7.5, 7.6, 7.7, and 7.8 of the Plan properly identify and describe the treatment of each class of claims or equity interests that is impaired under the Plan.

124.    Pursuant to Section 1123(a)(4) of the Bankruptcy Code, the Plan provides the same treatment for each claim or equity interest in a particular class.

125.    In accordance with Section 1123(a)(5) of the Bankruptcy Code, the Plan provides adequate means for its execution and implementation, including, without limitation, the operation and management of the Reorganized Debtor, the distributions to be made to holders of allowed claims and the means for making such distributions, the general injunction and the discharge injunction, the Permanent Channeling Injunction, the creation of the Asbestos Trusts, and the operation and administration of the Asbestos Trusts.

126.    Pursuant to Section 1123(a)(6) of the Bankruptcy Code, Section 13.5 of the Plan provides that entry of the Confirmation Order shall constitute a direction and authorization to the

Debtor, the Reorganized Debtor, and the Asbestos Trusts to take or cause to be taken any corporate action and other measures necessary or appropriate to consummate the provisions of the Plan, including without limitation, the adoption of the amended and restated certificate of incorporation and bylaws or similar constituent documents for the Reorganized Debtor.

127.    The Plan provides that, without further filing or notice, the certificate of incorporation of the Reorganized Debtor shall be deemed to prohibit the issuance of non-voting equity securities.

128.    In accordance with Section 1123(a)(7) of the Bankruptcy Code, the provisions of the Plan are consistent with the interests of the holders of claims and equity interests and with public policy with respect to the manner of selection of any officer and director of the Reorganized Debtor under the Plan.

129.    Pursuant to Section 1123(b)(1) of the Bankruptcy Code, the Plan impairs or leaves unimpaired each class of claims, secured or unsecured, or interests.

130.    Pursuant to Section 1123(b)(2) of the Bankruptcy Code, the Plan provides for the assumption of any unexpired lease or executory contract that has not been rejected with the Court's approval on or prior to the Effective Date, except those executory contracts and unexpired leases that the Chapter 11 Trustee designates as being subject to rejection on the Effective Date.

131.    In accordance with Section 1123(b)(6) of the Bankruptcy Code, the Plan includes other appropriate provisions not inconsistent with the Bankruptcy Code.

## Section 1129(a)(2) – The Plan Complies with the Provisions of the Bankruptcy Code

132.    The proponents of the Plan complied with all applicable provisions of the Bankruptcy Code, as required by Section 1129(a)(2) of the Bankruptcy Code.

33

133.    Specifically, in connection with the solicitation of votes on the Plan, the proponents disclosed to the holders of impaired claims adequate information as required by Section 1125(a) of the Bankruptcy Code.

134.    The proponents of the Plan, their respective agents, employees, and professionals, and any other entities that solicited acceptances of the Plan, acted in good faith within the meaning of Section 1125(e) of the Bankruptcy Code and are entitled to the protections afforded thereby.

**Section 1129(a)(3) – The Plan Was Proposed in Good Faith**

135.    The totality of the circumstances surrounding the formulation and proposal of the Plan demonstrate that the Plan is the result of extensive arms-length negotiations between and among the Chapter 11 Trustee, the Trade Committee, the Legal Representative, the ACC and others, and further demonstrate that the Plan was proposed in good faith and not by any means forbidden by law.

136.    The Plan was proposed with the legitimate and honest purpose of reorganizing the business affairs of the Debtor, maximizing returns to creditors of the Debtor, and resolving the Debtor's asbestos-related liabilities. The terms and conditions of the Plan and its exhibits, taken as a whole, are fair, equitable, reasonable, non-collusive, and in the best interests of the Debtor's creditors and its estate.

137.    The Plan achieves the goal of reorganization and rehabilitation of debtors embodied by the Bankruptcy Code. Further, the Plan's indemnification, exculpation, release and injunction provisions were negotiated in good faith, are consistent with Sections 105, 524, 1129 and 1141 and 1142 of the Bankruptcy Code, and are necessary to the Debtor's successful reorganization.

138.    The Chapter 11 Trustee, the ACC, the Legal Representative and the Trade Committee reasonably relied on the opinions of counsel, accountants, and other experts or professionals employed by the same in formulating the Plan, soliciting votes in support thereof and otherwise administering the Chapter 11 Case. Such reliance conclusively establishes good faith and the absence of willful misconduct.

**Section 1129(a)(4) – Approval of Certain Payments as Reasonable**

139.    All payments to be made from the Debtor's estate for costs and services to the estate in connection with the Debtor's Chapter 11 Case, or in connection with the Plan and incident to the Chapter 11 Case, to representatives, consultants, professionals and others, the approval of which is required under the Bankruptcy Code, either have previously been approved by the Court, were adequately disclosed in the Plan and the Disclosure Statement, or remain subject to approval by the Court as reasonable.

**Section 1129(a)(5) – Disclosure of Identity and Affiliations of the Debtor's New Management, the Asbestos Trustees, the Trust Advisory Committees, and the Post-Consummation Legal Representative; Compensation of Insiders Is Consistent with the Interests of Creditors and Equity Interests and Public Policy**

140.    The plan proponents duly and properly disclosed the identity and affiliations of the proposed directors and officers of the Reorganized Debtor, and the identity and compensation of insiders who will be employed by the Reorganized Debtor. The appointment or continuance of the proposed directors and officers of the Reorganized Debtor is consistent with the interests of the creditors and with public policy.

141.    The plan proponents also properly disclosed the identity and affiliations of the proposed trustees of each Asbestos Trust and the members of the Trust Advisory Committee for each trust.

**Section 1129(a)(6) – Approval of Rate Changes**

142.    The Debtor's current business does not involve the establishment of rates over which any regulatory commission has or will have jurisdiction after confirmation of the Plan.

**Section 1129(a)(7) – Best Interests of
Holders of Claims and Equity Interests**

143.    The liquidation analysis introduced at the Confirmation Hearing is reasonable and is supported by the evidence in the record.

144.    The holders of impaired claims against the Debtor who did not accept the Plan would receive less in a chapter 7 liquidation than the value that will be realized by the holders of such claims and equity interests under the Plan,

**Section 1129(a)(8) – Acceptance of
the Plan By Each Class Entitled to Vote**

145.    Class 1 under the Plan is unimpaired and is deemed to have accepted the Plan without voting.

146.    With respect to Classes 3, 4, 5, and 7, each of which is impaired, creditors that hold at least two-thirds in amount and more than one-half in number of the claims voting in each such class have accepted the Plan.

147.    With respect to each impaired class of asbestos-related claims, more than seventy-five percent (75%) of those voting in each such class have accepted the Plan, thereby satisfying the voting requirement in Section 524(g)(2)(B)(ii)(IV)(bb) of the Bankruptcy Code.

148.    Classes 2 (Secured Claims) and 6 (Litigation Claims) neither accepted nor rejected the Plan because no ballots were cast in those classes.    Moreover, Class 8 (Equity Interests) was deemed to have rejected the Plan without voting, by operation of law. Nevertheless, the Plan is confirmable because, as the Court concludes below, it satisfies Section

1129(b)(1) of the Bankruptcy Code with respect to such non-accepting classes of claims and interests.

### Section 1129(a)(9) – Treatment of Priority Claims

149.    The Plan provides for the treatment of administrative expense claims, priority tax claims and claims entitled to priority pursuant to Sections 507(a)(3)-(8) of the Bankruptcy Code in the manner required by Section 1129(a)(9) of the Bankruptcy Code.

### Section 1129(a)(10) – Acceptance of the Plan by Each Impaired Class

150.    The Plan has been accepted by Classes 3, 4 and 5, determined without including any acceptance of the Plan by any insider. Each of these accepting classes is impaired under the Plan.[5]

### Section 1129(a)(11) – Feasibility of the Plan

151.    Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Reorganized Debtor.

### Section 1129(a)(12) – Payment of Statutory Fees

152.    The Plan provides that on the Effective Date and thereafter as may be required, the Debtor or the Reorganized Debtor, as the case may be, shall file all required reports and pay all fees payable to the United States Trustee pursuant to 28 U.S.C. §1930(a)(6) as and when due and shall continue to pay such fees and make such reports in accordance with applicable law.

### Section 1129(a)(13) – Payment of Retiree Benefits

153.    The Plan provides that after the Effective Date, the Reorganized Debtor shall continue to pay all "retiree benefits" as defined in Section 1114 of the Bankruptcy Code, at the

---

[5]    Class 7, which is composed solely of the Claims of insiders of the Debtor, also accepted the Plan.

levels established prior to confirmation of the Plan, for the duration of the period that the Debtor obligated itself to provide such benefits, if any, under any plan, fund or program for such benefits.

### Section 1129(d) – Principal Purpose Not Tax Avoidance

154.    No governmental unit or taxing authority requested the Court to deny confirmation of the Plan on grounds that the principal purpose of the Plan is the avoidance of taxes or the avoidance of the application of Section 5 of the Securities Act of 1933 and the primary purpose of the Plan is not such avoidance.

### Cram-Down – Section 1129(b)

155.    Because no votes were cast either to accept or to reject the Plan by Classes 2 and 6, each of these impaired classes cannot be deemed to have accepted the Plan merely because of the absence of any ballots voted by the class.  Each of these classes, therefore, is treated as if it has not accepted the Plan.  E.g., *In re Higgins Slack Co.*, 178 B.R. 853 (Bankr. N.D. Ala. 1995). Accordingly, to be confirmed, the Plan must satisfy the requirements of Section 1129(b) of the Bankruptcy Code.

156.    To be confirmed under Section 1129(b), the Plan must not "discriminate unfairly and [must be] fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." 11 U.S.C. § 1129(b)(1).

157.    To be confirmed under Section 1129(b) with respect to a dissenting impaired class of secured claims, the pertinent part of Section 1129(b)(2)(A) requires that:

> … the plan provides –
>
> (i) (I) that the holders of such claims retain the liens securing such claims whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

> (II) that each holder of such a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;
>
> *    *    *
>
> or
>
> (iii) for the realization by such holders of the indubitable equivalent of such claims.

11 U.S.C. § 1129(b)(2)(A).

158.    The Plan properly classifies each Secured Claim in a separate class (Plan § 5.1.2).

159.    By reason of MFS's continued right to the MFS Lien (until determination of the pending objection to its alleged secured claim), as reduced by agreement of MFS, against the MFS Escrow pursuant to the MFS Stipulation (Hearing Exh. 7), the Plan satisfies Section 1129(b)(2)(A) with respect to Class 2, the Plan does not unfairly discriminate against the sole claim that would be in the class (the claim of MFS), and is fair and equitable with respect to that class. Accordingly, the Plan satisfies the requirements of Section 1129(b)(2)(A)(i) and (iii), and may be imposed upon Class 2.

160.    Class 6 under the Plan consists of allowed Non-Asbestos-Related Products Liability and Other Non-Insider Litigation Claims. Class 6 is an impaired class of unsecured claims.

161.    To be confirmed under Section 1129(b) with respect to a dissenting class of unsecured claims, the pertinent part of Section 1129(b)(2)(B) requires that:

> (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of

a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

(ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.

11 U.S.C. § 1129(b)(2)(B).

162.    The Plan properly classifies Litigation Claims in a separate class (Plan § 5.1.6). See In re Jersey City Medical Center, 817 F.2d 1055 (3d Cir. 1987) (upholding separate classification arrangement under plan providing for class of physician creditors of debtor hospital to receive 100% recovery on their contract indemnity claims, and for class of malpractice creditors to receive 30% recovery on their claims); In re Rochem, Inc., 58 B.R. 641 (Bankr. D.N.J. 1985) (granting cram-down; approving separate classification and treatment of unliquidated tort claimants and undisputed general trade creditors).

163.    The Plan does not unfairly discriminate against the claims in Class 6, and is fair and equitable with respect to that class. See In re Sacred Heart Hosp. of Norristown, 182 B.R. 413 (Bankr. E.D. Pa. 1995) (granting cram-down; approving separate classification and treatment of tort creditors whose claims were covered by proceeds of insurance which was not available to other creditors); In re Mahoney Hawkes, LLP, 289 B.R. 285 (Bankr. D. Mass. 2002) (upholding separate classification of tort claims covered by insurance).  In addition, no class of claims or interests that is junior to Class 6 will receive or retain any property under the Plan on account of its claims or interests, as the case may be.

164.    Accordingly, the Plan satisfies the requirements of Section 1129(b)(2)(B)(ii), and may be imposed upon Class 6.

165.    Class 8 under the Plan consists of allowed Equity Interests.

166.    The Plan properly classifies Equity Interests in a separate class (Plan § 5.1.8).

167.    There is no class of interests or claims junior to Class 8.  Under the Plan, holders of interests in Class 8 do not receive or retain any property on account of their stockholdings in the Debtor. Accordingly, the Plan may be imposed upon Class 8.

168.    The Plan satisfies Section 1129(b)(1) of the Bankruptcy Code because it does not "discriminate unfairly" and is "fair and equitable" with respect to Classes 2, 6 and 8.

### The Asbestos Trusts and the Permanent Channeling Injunction Comply With Section 524(g) of the Bankruptcy Code

169.    In accordance with Section 524(g)(1) of the Bankruptcy Code, the Plan provides that the Permanent Channeling Injunction will be issued in connection with the Order confirming the Plan.   The Permanent Channeling Injunction is set forth in Section 1.1.78 of the Plan. Pursuant to Section 16.3, the Plan grants the benefits and protections of the Permanent Channeling Injunction to the "Protected Parties" and "Released Parties" enumerated in the Plan. Those persons, in turn, are identified in Section 1.1.89 and 1.1.94 of the Plan.

170.    By reason of the execution of the Verhalen Settlement Agreement, the approval of the Verhalen Settlement Agreement by the order of the Bankruptcy Court (Fitzgerald, B.J.) dated September 7, 2005 (Hearing Exh. 8), and the vote by James P. Verhalen, Sr., to accept the Plan as a creditor in Class 7, the persons and entities originally identified as "Excluded Persons" in Section 1.1.56(a)-(o) of the Plan[6] are entitled to be treated as "Protected Parties" and "Released

---

[6]    Those entities are:

    (a)    James P. Verhalen, Sr., individually and in his capacities as Chairman of the Board, an officer and/or director of the Debtor, and as Trustee of the ESOP (*provided, however,* that James P. Verhalen, Sr., shall not be an Excluded Party to the extent of his capacity as a QSF Co-Administrator);

    (b)    Glenn Redbord;

Footnote Continued . . .

Parties" for purposes of the Plan, including the Permanent Channeling Injunction. Accordingly, the definitions of Protected Parties and Released Parties shall include those persons and entities.

171.    There has been proper notice of the Confirmation Hearing.  Except as otherwise expressly allowed by the terms of the Permanent Channeling Injunction, the Confirmation Order and the Plan, respectively, the Permanent Channeling Injunction properly enjoin entities from taking legal action for the purpose of directly or indirectly collecting, recovering or receiving payment or recovery with respect to any claim or demand that, under the Plan, is to be paid in whole or in part by the Asbestos Trusts.

172.    The Plan and the Permanent Channeling Injunction satisfy the requirements of Section 524(g) of the Bankruptcy Code.

---

. . . Continued Footnote

     (c)    Jane Cee Redbord;

     (d)    the ESOP, (excluding any participants therein other than James P. Verhalen, Sr.);

     (e)    the Cafco Europe Companies;

     (f)    CIL Group, Ltd., and all direct and indirect subsidiaries thereof;

     (g)    Cafco Europe Group, S.A.;

     (h)    Cafco UK, Ltd.;

     (i)    J.P. Verhalen, L.L.C. and/or James P. Verhalen LLC;

     (j)    Verhalen Family Holdings, LLC;

     (k)    Carl Turner;

     (l)    Francis P. Pandolfi;

     (m)    Florence W. Verhalen;

     (n)    all shareholders, interest holders and holders of any equity interests in Verhalen Family Holdings, L.L.C., J.P. Verhalen, L.L.C., and/or James P. Verhalen  LLC, in their capacities as shareholders, interest holders and/or holders of any such equity interests; and

     (o)    all persons who served as directors and/or officers of Dalen Corporation at any time prior to December 28, 1998, in their capacities as directors and officers of such entity.

173.    In accordance with Section 524(g)(4)(A), the Permanent Channeling Injunction shall be valid and enforceable against all entities that it addresses because the Protected Parties are all appropriate third parties eligible for protection pursuant to Section 524(g)(4)(A)(ii) of the Bankruptcy Code.

174.    In accordance with Section 524(g)(4)(B)(ii) of the Bankruptcy Code, in light of the benefits provided, or to be provided, to the Asbestos Trusts by or on behalf of each Protected Party, the Permanent Channeling Injunction is fair and equitable with respect to persons that might subsequently assert Demands.

175.    The Plan otherwise complies with Section 524(g) of the Bankruptcy Code.

### Qualification of the Asbestos Trusts as Qualified Settlement Funds Under the Internal Revenue Code and Treasury Regulations

176.    <u>Requirements for Creation of a Qualified Settlement Fund.</u>  Section 468B of title 26, United States Code (the "Internal Revenue Code"), and regulations promulgated thereunder provide for the creation and qualification of a "qualified settlement fund", which is entitled to certain treatment under the Internal Revenue Code. A "qualified settlement fund" under Internal Revenue Code § 468B and Treasury Regulation § 1.468B-1 is a "fund, account, or trust" that is: (i) set up pursuant to a statute or court order, and would be subject to the continuing jurisdiction of that governmental authority,[7] (ii) established to "resolve or satisfy" contested or uncontested claims arising out of a tort, among other specified bases of liability;[8] and (iii) treated as a trust

---

[7]    <u>See</u> Treas. Reg. § 1.468B-1(c)(1), which requires that the "fund, account, or trust" must be established "pursuant to an order of, or is approved by, the United States, any state (including the District of Columbia), territory, possession, or political subdivision thereof, or any agency or instrumentality (including a court of law) of any of the foregoing and is subject to the continuing jurisdiction of that governmental authority."

[8]    Treas. Reg. § 1.468B-1(c)(2) requires, in pertinent part, that the "fund, account, or trust" must be established:

Footnote Continued . . .

under applicable state law, or its assets would otherwise be segregated from the other assets of the transferor and related persons. See Treas. Reg. § 1.468B-1(c).

177.    Asbestos Trusts Constitute "Qualified Settlement Funds" for Federal Tax Purposes. Each Asbestos Trust will be a "qualified settlement fund" under and pursuant to Section 468B of the Internal Revenue Code, and the regulations promulgated thereunder at Treasury Regulations §§ 1.468B-1, 2. 3 and 4. The establishment of the Asbestos Trusts under the Plan meets the "resolve or satisfy" requirement of Treasury Regulations §§ 1.468B-1(c)(2) and (f). The transfers by the Debtor and the Reorganized Debtor of the Asbestos Trust Contribution, as allocated under the Plan between the Asbestos Trusts, shall constitute qualified contributions to the Asbestos Trusts under the Internal Revenue Code and Treasury Regulations.

178.    Asbestos Trusts, as Qualified Settlement Funds, to Remain Separate from the Debtor and the Reorganized Debtor. All sums or property deposited or transferred into each Asbestos Trust shall at all times be kept separate and apart from all other funds or property of the Debtor or the Reorganized Debtor. Once transferred, the property, funds and proceeds (including investment earnings) of each Asbestos Trust shall not constitute property of the Debtor or the Reorganized Debtor. Each Asbestos Trust, as a qualified settlement fund, shall be a separate entity for all purposes, including tax purposes.

---

... Continued Footnote

"...to resolve or satisfy one or more contested or uncontested claims that have resulted or may result from an event (or related series of events) that has occurred and that has given rise to at least one claim asserting liability—

* * *

(ii) Arising out of a tort, breach of contract, or violation of law ...."

179.    <u>Payment Only of Qualified Claims</u>. The property, funds and the proceeds (including any investment earnings) of each Asbestos Trust, as a qualified settlement fund, shall be used solely for (a) the benefit of holders of the Asbestos-Related Claims and Demands channeled to such trust, as provided in the Plan, the Confirmation Order, and the Asbestos Trust Document for such trust; and (b) payments of fees and costs of such Asbestos Trust as permitted by the Plan, the Confirmation Order and the Asbestos Trust Documents for such trust.  Asbestos-Related Claims and Demands, and trust fees and costs under this paragraph shall constitute "qualified claims" within the meaning of Treasury Regulations § 1.468B-1(c)(2) and for the purposes of this Order ("Qualified Claims").

180.    <u>No Reversion to Debtor or Reorganized Debtor</u>.  In no event shall any of the sums in an Asbestos Trust, as a qualified settlement fund, be: (i) refunded to or revert to the Reorganized Debtor or any subsidiary or affiliate of the Reorganized Debtor without the prior written consent of the Trustees and the TAC for such trust; or (ii) used for distributions to any creditors of the Debtor other than those asserting and holding Qualified Claims.

181.    <u>Retention of Jurisdiction</u>.  The Bankruptcy Court shall retain jurisdiction over each Asbestos Trust, as a qualified settlement fund, for the benefit of persons holding Qualified Claims with respect to such trust, until the earlier of (a) the entry of an order dismissing, or a final decree closing, the Debtor's bankruptcy case; (b) such time as all funds in such trust have been disbursed in accordance with the Plan, this Order, the Asbestos Trust Documents for such trust, or any further order of the Bankruptcy Court; or (c) further order of the Bankruptcy Court. In the event the Bankruptcy Court for any reason declines or fails to take jurisdiction of any matter pertaining or relating to the qualification or operation of the Asbestos Trust as a "qualified settlement fund", or if the Debtor's bankruptcy case is closed, then any aggrieved party with

respect to such matter may seek relief in a court of competent subject matter jurisdiction within the State of Delaware.

### Approval of the Discharge, Releases,
### Injunctions and Exculpations Under the Plan

182.    This Court has the power and authority under Section 1141 and/or Section 105(a) of the Bankruptcy Code to enter the discharge, injunctions, releases and exculpations contemplated by the Plan which, among other things, implement and facilitate consummation and performance of the Plan, and prohibit any Entity from attempting to circumvent the Plan and the orders of this Court.[9]

183.    Subject to issuance or affirmance of the Permanent Channeling Injunction by the District Court, this Court has the power and authority under Section 524(g) to enter the Permanent Channeling Injunction contemplated by the Plan.

184.    In accordance with Bankruptcy Rule 3020(c), each of the Permanent Channeling Injunction, the general injunction and the discharge injunction under the Plan describes in reasonable detail the acts enjoined by the injunction.

185.    The injunctions to be granted under the Plan and under the order granting confirmation are fair and equitable and in the best interest of the Debtor, its estate, creditors and other parties in interest, will maximize the value of the bankruptcy estate by preserving and protecting the ability of the Reorganized Debtor to continue operating outside of bankruptcy protection and in the ordinary course of business; and are essential to the successful reorganization of the Debtor.

186.    The releases, waivers, exculpations, indemnities and injunctions granted under the Plan are essential to the Debtor's successful reorganization, and are consistent with applicable law.

187.    All releases, discharges, and injunctions with respect to claims and causes of action against the Protected Parties set forth in the Plan are inextricably intertwined with, are an integral part of, the Plan. The releases, discharges and injunctions are fair, equitable, reasonable, and in the best interests of the Debtor and its estate, the Reorganized Debtor, the Asbestos Trusts, and holders of claims, equity interests and Demands.

## Compliance with Bankruptcy Rule 3016

188.    The Plan is dated and identifies the name of the entities that submitted it or filed it, as required by Bankruptcy Rule 3016(a).

189.    The Plan and the Disclosure Statement describe in specific and conspicuous language, identified in bold-faced type, all acts to be enjoined and the entities subject to the injunctions under the Plan, as required by Bankruptcy Rule 3016(c).

## No Successor Liability

190.    Neither the Protected Parties, the Reorganized Debtor nor the Asbestos Trusts is, or shall be, a successor to the Debtor by reason of any theory of law or equity, and none shall have any successor or transferee liability of any kind or character, except that the Reorganized Debtor and the Asbestos Trusts shall assume the obligations specified in this Plan and this Order.

---

. . . Continued Footnote

9    By reason of the Verhalen Settlement Agreement (see Paragraph 170 above), the Protected Parties and Released Parties benefited by the releases and injunctions include the persons who were formerly the Excluded Parties identified in Note 7 above.

**Vesting of Assets; Discharge of Liabilities**

191.    Except as otherwise provided in the Plan, on the Effective Date, the property and assets of the Debtor's estate under Section 541 of the Bankruptcy Code shall vest in the Reorganized Debtor, free and clear of all Claims (other than those provided for or recognized in connection with the Exit Loan Facility) and Interests, but subject to the obligations of the Reorganized Debtor set forth in the Plan and in this Order. Except as otherwise provided in the Plan or in this Order, commencing on the Effective Date and subject to the terms of the Plan and this Order, the Reorganized Debtor may then and thereafter deal with its assets and property, and may conduct its business and affairs, without supervision of, or permission from, the Bankruptcy Court or the Office of the United States Trustee, and free of any restrictions imposed on the Debtor by the Bankruptcy Code, Bankruptcy Rules, or by the Court during the Chapter 11 case.

192.    Pursuant to Section 1141(d)(1) of the Bankruptcy Code, the Debtor is entitled to (a) a discharge from Claims that arose before confirmation of the Plan (but not a discharge of Demands, which are permanently enjoined and channeled to the Asbestos Trusts pursuant to the Permanent Channeling Injunction), whether or not a proof of claim based on such Claim is filed or deemed filed under Section 501 of the Bankruptcy Code, such Claim is allowed under Section 502 of the Bankruptcy Code, or the holder of such Claim has accepted the Plan; and (b) termination of all rights and interests of the Debtor's equity holders provided by the Plan.

**Exemptions from Securities Laws**

193.    Pursuant to Section 1125(d) of the Bankruptcy Code, the transmittal of the Solicitation Materials, the solicitation of acceptances of the Plan and the issuance and distribution of any securities pursuant to the Plan, and the Chapter 11 Trustee's, ACC's, Debtor's or Reorganized Debtor's participation in such activities, are not and will not be governed by or

subject to any otherwise applicable law, rule or regulation governing the solicitation of acceptance or rejection of a plan of reorganization or the offer, issuance, sale, or purchase of securities.

194.    Pursuant to Section 1145(a)(1) of the Bankruptcy Code, the offering, issuance and distribution pursuant to the Plan of any distributions that may be deemed to be securities shall be exempt from Section 5 of the Securities Act of 1933, as amended, and from any state or local law requiring registration, notification, qualification or exemption prior to the offering, issuance, distribution, or sale of securities.

### Exemptions from Taxation

195.    Pursuant to Section 1146(c), the issuance, transfer or exchange of any security contemplated by the Plan, or the making or delivery of an instrument of transfer under the Plan, may not be taxed under any law imposing a stamp tax or similar tax.

### Miscellaneous

196.    Environmental Remediation Payment.  On the Effective Date, the Chapter 11 Trustee, on account of the Debtor, is authorized to pay or to cause the Debtor to pay the sum of not more than $2,000,000 to the RTF to be established on the Effective Date pursuant to a remediation agreement between the Debtor, the Reorganized Debtor and the Chapter 11 Trustee, on the one hand, and NJDEP, on the other hand.

197.    Conditions Precedent to Entry of the Confirmation Order.  With the exception of further action by the District Court pursuant to Section 524(g) of the Bankruptcy Court with respect to the issuance or affirmance of the Permanent Channeling Injunction, each of the conditions precedent to the entry of the Confirmation Order, as set forth in Article 11.1 of the Plan, has been satisfied or waived, or will be satisfied upon the entry of this Order on the docket.

**CONCLUSION**

198.    In accordance with Bankruptcy Rule 9021, the Court will enter a separate order confirming the Plan ("Confirmation Order").  In accordance with Bankruptcy Rule 3020(c), the Confirmation Order will set forth the Permanent Channeling Injunction, the discharge injunction and the general injunction under the Plan, and will identify the entities subject to the respective injunctions.  To the extent necessary, the Confirmation Order will report and recommend that the District Court issue or affirm the Permanent Channeling Injunction.

**SO FOUND, ORDERED AND ADJUDGED** in Wilmington, Delaware, on November 29, 2005.

_____
JUDITH K. FITZGERALD
United States Bankruptcy Court Judge